### Ex parte DUNCAN.

### KAHANAMOKU, Sheriff, v. DUNCAN.

### No. 10763.

Circuit Court of Appeals, Ninth Circuit.
March 1, 1946.

Nunc pro Tunc as of Nov. 1, 1944.

For majority opinion, see 146 F.2d 576.

Before WILBUR, GARRECHT, DENMAN, MATHEWS, STEPHENS and HEALY, Circuit Judges.

STEPHENS, Circuit Judge (dissenting).

In the conference held after the oral argument made to the Judges of this court sitting en banc in the above entitled case and its associate case Steer et al. v. White, 146 F.2d 576, I expressed the view that the judgments should be affirmed. My associates, however, were of the opinion that they should be reversed. Thereafter I prepared and distributed to the court members an opinion in the Duncan case, in support of my views. The court filed its opinion and decision reversing in both cases. I was keenly aware of the fact that the war was yet to be won and that a dissenting opinion in these cases held more possibility of harm than of good and I withheld it.

Now that the war is over and the Supreme Court has filed its opinion and decision (66 S.Ct. 606) there is nothing to be gained by further withholding it.

The opinion is the result of intensive reading and study and is thoroughly documented. I believe it to be a substantial contribution to the history of one of the most unique and important episodes in our nation's existence. For the reason stated and because I desire my position made clear I have sought and obtained approval of our Senior Judge for filing it with the clerk of the court at this time.

This is an appeal by the respondent from the order of the United States District Court for the Territory of Hawaii in an Habeas Corpus proceeding, directing that the appellee, Lloyd C. Duncan, be released from the custody of the appellant. Pending the hearing in the district court appellee was released on bail, and pending this appeal he was released on his own recognizance.

Duncan, a civilian workman in the Navy Yard at Pearl Harbor, Territory of Hawaii, was arrested by the naval authorities for an attack upon two marines, who were stationed as guards at a navy yard gate. He was taken before a naval officer, sitting as a Provost Judge, was tried, found guilty and sentenced to six months imprisonment. He was committed to the Sheriff of the City and County of Honolulu, respondent-appellant, and by

him imprisoned in the city and county jail.[1]

It will always be remembered by the people of the civilized world that on Sunday morning of December 7, 1941, while the Republic of the United States and the Empire of Japan were at peace with each other, and while special representatives of Japan were conferring in Washington with the Secretary of State upon grave differences then existing between the two countries, a group of Japanese war planes struck and seriously damaged a large number of Navy vessels belonging to the United States Pacific Fleet, then in Pearl Harbor adjacent to Honolulu, and destroyed a large part of the United States aircraft and personnel at nearby Hickam Field. Almost at the same time the Japanese attacked other Pacific Island possessions of the United States and attacked the Philippine Islands and possessions of other nations.

While the basic question in every habeas corpus proceeding is the legality of the restraint complained of, the question of jurisdiction is always paramount.

In this proceeding it is not disputed that the United States District Court of the Territory of Hawaii possesses general jurisdiction of habeas corpus proceedings, and, of course, it has, but it is claimed that neither said court nor any other court had the jurisdiction to entertain or make any decisive order in respect of any petition for writ of habeas corpus affecting any person in the Territory of Hawaii for the reason that the privilege of the writ was legally suspended in such territory during all of the times relevant to these proceedings.

As recited in a case decided by this court, Ex parte Zimmerman, 9 Cir., 132 F.2d 442-444, only a very few hours after the Japanese attack upon Pearl Harbor the then Governor of the Territory, acting under a Territorial statute [§ 5(a) Act 24 Laws, Special Session Territory Legislation 1941], declared the existence of a defense period, and acting under § 67 of the Hawaiian Organic Act, 48 U.S.C.A. § 532,[2] proclaimed martial law and suspended the privilege of the writ of habeas corpus "until further notice." These actions, though perhaps not the text of the proclamations, were communicated to the President, who approved them.

Appellee claims that the privilege of the writ was not legally suspended by the above noted actions, but this court took the opposite view in the Zimmerman case.[3]

It may be overstating the claim of appellant to say that he is of the opinion that once the privilege of the writ is suspended it remains suspended until officially reinstated. At any rate he does hold to the opinion that the circumstances which moved the Governor to order the suspension continue in kind if not in degree and that the suspension remains effective.

I am of the opinion that the privilege of the writ is at all times the right of everyone, except for the period during which facts exist which authorize its suspension. The unrevoked proclamation of suspension on December 7, 1941, is therefore, not conclusive that the privilege was in suspension on the 14th day of March,

[1] In appellant's return to the petition for writ of habeas corpus, it is said that appellee was tried "for the offense of unlawfully, wilfully and maliciously assaulting, striking, beating and ill-treating two Marine sentries at the Main Gate, Navy Yard, Pearl Harbor, T. H., with intent to resist, prevent, hinder and obstruct the said sentries in the lawful discharge and execution and performance of their official duties at the Main Gate, Navy Yard, Pearl Harbor, T.H., contrary to General Orders No. 2, Paragraph 8.01 of the Military Governor of the Territory of Hawaii, dated March 10, 1943." The General Orders referred to provides: "No person shall commit an assault or an assault and battery on any military police, any member of the shore patrol, or other military or naval personnel, with intent to resist, prevent, hinder, or obstruct him in the discharge, execution, or performance of his duty as such, nor shall any person wilfully interfere or attempt to interfere with any military police, any member of the shore patrol, or other military or naval personnel in the performance of his official, defined, or required duties as such."

[2] See Kuykendall, Constitutions of the Hawaiian Kingdom (1940); Papers of the Hawaiian Historical Society, No. 21; Thurston, The Fundamental Law of Hawaii (1904); In re Kalanianaole, 1895, 10 Haw. 29, 62.

[3] The notes to the Zimmerman case recite relative portions of documents of importance in this case.

1944, when Duncan sought the writ.[4] Therefore, the proclamation of the Governor ordering the suspension does not preclude Duncan from filing his petition with a functioning United States Judge or Court.[5]

Originally it was, quite evidently, the thought of the Commanding General of the Territory that the Governor's proclamation acted to completely wipe out the right of habeas corpus until the issuance of a counter-proclamation, and that no court or any officer of any court, including this or the Supreme Court, had a right to take any step in the furtherance of such a proceeding. General Orders No. 31 of the Commanding General issued under the title of Military Governor is that inclusive. Later, however, General Orders No. 31 was withdrawn and no one claims in this proceeding that Duncan was without the legal right to file his petition and that the court could issue its order to show cause and that thereupon it would become incumbent upon respondent to justify.

Respondent, however, did contend that the court should have refused to issue the writ and should have dismissed the petition upon being presented with affidavits to the effect that facts continued to exist which justified withholding the privilege. This the court refused to do, but, instead, issued the writ and promptly began the taking of evidence as to relevant facts then prevailing. This, I think, was proper procedure. At the conclusion of the receipt of evidence and after argument the court held that conditions obtaining at the time of filing the Duncan petition did not act to justify the withholding of the privilege and that therefore the court had jurisdiction to hear and decide upon the merits of the petition.

As the issues of jurisdiction and of the merits depend much upon the same evidentiary support, I shall proceed to state further facts as they are revealed in the record of the proceedings.

In order to fully understand the problems herein treated, it will be necessary to have in mind certain documents, the material parts of which I set out in the margin.[6]

---

[4] See Sterling v. Constantin, 1932, 287 U.S. 378, 400, 53 S.Ct. 190, 77 L.Ed. 375; compare Moyer v. Peabody, 1909, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410.

[5] See People v. Gaul, 1865, 44 Barb., N. Y., 98; and Ex parte Quirin, 1942, 317 U.S. 1, 25, 63 S.Ct. 1, 2, 87 L.Ed. 3.

[6] **Constitution of the United States.** Art. I, Sec. 9, Cl. 2: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

Art. IV, Sec. 3, Cl. 2: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."

**Amendments.** Art. V. "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any Criminal Case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

Art. VI. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence."

**Hawaiian Organic Act. Constitution and laws of United States in effect.** The Constitution, and, except as otherwise provided, all the laws of the United States, including laws carrying general appropriations, which are not locally inapplicable, shall have the same force and effect within the said Territory as elsewhere in the United States: Provided, That sections 1453–1455, 1457–1460, 1460a, 1463, 1463a, 1465, 1467–1473, and 1457, 1478, 1479 and 1480 of this title, shall not apply to Hawaii. (Apr. 30, 1900, ch. 339, Sec. 5(a), 31 Stat. 141; May 27, 1910, Ch. 258, Sec. 1, 36 Stat. 443; Apr. 12, 1930, ch. 136, 46 Stat. 160; June 6, 1932, ch. 209, Sec. 116(b), 47 Stat. 205, 48 U.S.C.A. 495.

\*      \*      \*      \*      \*      \*

Only those who are so deeply immersed in strict legalism that reality escapes them can possibly entertain any feeling but admiration for the military, the civil officials and citizenry of Honolulu for the prompt and orderly manner in which they acted almost in the echo of the bombs which had killed so many of our service men and

"**Governor to execute laws.** The governor shall be responsible for the faithful execution of the laws of the United States and of the Territory of Hawaii within the said Territory, and whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, or summon the posse comitatus, or call out the militia of the Territory to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory, and he may, in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it, suspend the privilege of the writ of habeas corpus, or place the Territory or any part thereof, under martial law until communication can be had with the President and his decision thereon made known." Apr. 30, 1900, ch. 339, Sec. 67, 31 Stat. 153, 48 U.S.C.A. § 532.

Section 5(a) of the Hawaii Defense Act (Act 24 of Laws of Hawaii, Special Session 1941, approved October 3, 1941) provides:

"Whenever there exists (1) any state of affairs or circumstances arising out of an invasion, attack, insurrection, rebellion, or lawless violence, or any danger or threat thereof, or (2) any state of affairs or circumstances making it advisable to protect the Territory and its inhabitants, of the existence of any of which the Governor shall be the sole judge, the Governor, by proclamation, may declare a defense period to exist. A defense period may be declared for any one or more counties, or a part of a county, and when once declared shall continue until the Governor, by proclamation, shall declare the defense period at an end. Such proclamations shall be promulgated by publication thereof, or by posting copies of the same in at least ten public places in each county, or part thereof, affected by any such defense period, or, when immediate promulgation is necessary in the opinion of the Governor, who shall be the sole judge thereof, by official announcement thereof by him by means of radio broadcast."

**Proclamation of Existence of Defense Period.**

Under and by virtue of the powers vested in me by Act 24 of the Special Session Laws of Hawaii, 1941, and particularly Section 5 thereof, and under and by virtue of all other powers in me vested by law, I, J. B. Poindexter, Governor of the Territory of Hawaii, do hereby find that a state of affairs exists arising out of an attack upon the Territory of Hawaii and that all of the circumstances make it advisable to protect the Territory and its inhabitants as provided in and by said Act 24 of the Special Session Laws of Hawaii 1941, and all other laws relating thereto; and by reason of the foregoing,

I do declare and proclaim a defense period to exist throughout the Territory of Hawaii.

This proclamation shall take effect upon promulgation thereof by official announcement by me by means of radio broadcast which I do further declare to have taken place at 11:30 o'clock A.M. on the date hereof.

Done at Honolulu, Territory of Hawaii this 7th day of December, 1941.

Joseph B. Poindexter,
Governor of the Territory of Hawaii.

**General Orders No. 4.**
7 December 1941

By virtue of the power vested in me as Military Governor, the following policy governing the trial of civilians by Military Commissions and Provost Courts is announced for the information and guidance of all concerned:

1. Military commissions and provost courts shall have power to try and determine any case involving an offense committed against the laws of the United States, the laws of the Territory of Hawaii or the rules, regulations, orders or policies of the military authority. The jurisdiction thus given does not include the right to try commissioned or enlisted personnel of the United States Army and Navy. Such persons shall be turned over to their respective services for disposition.

2. Military commissions and provost courts will adjudge sentences commensurate with the offense committed. Ordinarily, the sentence will not exceed the limit of punishment prescribed for similar offenses by the laws of the United States or the Territory of Hawaii. However, the courts are not bound by the limits of punishment prescribed in said laws and in aggravated cases and in cases of repeated offenses the courts may adjudge an appropriate sentence.

3. The record of trial in cases before military commissions will be substantially similar to that required in a special court martial. The record of trial in cases before provost courts will be sub-

which had done so great a damage. The text of the Governor's proclamation was to the effect that the Governor was placing the Commanding Officer in his place temporarily. However, no one in this case has gone so far as to contend that there was any law authorizing this extreme action, and no one is here contend-

stantially similar to that in the case of a Summary Court Martial.

4. The procedure in trials before military commissions and provost courts will follow, so far as it is applicable, the procedure required for Special and Summary Courts Martial respectively.

5. The records of trial in all cases will be forwarded to the Department Judge Advocate. The sentences adjudged by provost courts shall become effective immediately. The sentence adjudged by a military commission shall not become effective until it shall have been approved by the Military Governor.

6. All charges against civilian prisoners shall be preferred by the Department Provost Marshal or one of his assistants.

7. The Provost Marshal is responsible for the prompt trial of all civilian prisoners and for carrying out the sentence adjudged by the court.

8. Charges involving all major offenses shall be referred to a military commission for trial. Other cases of lesser degree shall be referred to provost courts. The maximum punishment which a provost court may adjudge is confinement for a period of 5 years, and a fine of not to exceed $5000.00. Military Commissions May Adjudge Punishment Commensurate With The Offense Committed And May Adjudge The Death Penalty In Appropriate Cases.

9. In adjudging sentences, provost courts and military commissions will be guided by, but not limited to the penalties authorized by the courts martial manual, the laws of the United States, the Territory of Hawaii, the District of Columbia, and the customs of war in like cases.

Thomas H. Green,
Lt. Col. J. A. G. D.
Executive Officer.

**Proclamation.** Whereas a Proclamation by Joseph B. Poindexter, Governor of the Territory of Hawaii, dated December 7, 1941, reciting that "the armed forces of the Empire of Japan have this day attacked and invaded the shores of the Hawaiian Islands" and the "the public safety requires" the acts set forth in the said Proclamation, declared martial law and authorized and requested the Commanding General, Hawaiian Department, to exercise the powers normally exercised by judicial officers and employees of this Territory and of the counties and cities therein; and

Whereas the Commanding General, Hawaiian Department, has since determined that it is no longer impossible for the judicial officers and employees of this Territory and of the counties and cities therein to function, within limits set forth in various orders;

Now, Therefore, I, Ingram M. Stainback, hereby proclaim that after the date of this Proclamation the powers normally exercised by judicial officers and employees of this Territory and of the counties and cities therein shall be exercised by such officers and employees, subject to such limitations and restrictions as may be imposed by military authority. The Proclamation of December 7, 1941, above cited, is amended accordingly.

In Witness Whereof, I have hereunto set my hand and caused the seal of the Territory of Hawaii to be affixed.

Done at Honolulu, Territory of Hawaii, this 2nd day of September, 1942.
(Seal) (Signed) Ingram M. Stainback,
Governor of the Territory of Hawaii.

**Constitution of 1852. (Monarchy)** Article 5. The privilege of the writ of Habeas Corpus belongs to all men, and shall not be suspended, unless by the King, when, in cases of rebellion or invasion, the public safety shall require its suspension.

Article 6. The rights of trial by jury, in all cases in which it has been heretofore used in this Kingdom, shall remain inviolate forever.

Article 12. Slavery shall, under no circumstances whatever, be tolerated in the Hawaiian Islands: whenever a slave shall enter Hawaiian territory he shall be free; no person who imports a slave, or slaves, into the King's dominions shall ever enjoy any civil or political rights in this realm; but involuntary servitude for the punishment of crime is allowable according to law.

Article 18. The Military shall always be subject to the laws of the land, and no soldier shall, in time of peace, be quartered in any house, without the consent of the owner; nor in time of war, but in a manner to be prescribed by the Legislature.

Article 39. The King, by and with the approval of His Cabinet and Privy Council, in case of invasion or rebellion, can place the whole Kingdom, or any part of it under martial law and he can ever alienate it, if indispensable to free it from

948

ing that there ever was such an official position as Military Governor. Yet the Governor did practically and actually abdicate his office and the Commanding General did assume the title of Military Governor and did assume to govern the Territory under that title.

Unquestionably the belief entertained by the Commanding General that he, as Military Governor, had command of

the insult and oppression of any foreign power.

**Constitution of 1864. (Monarchy)** Article 5. The privilege of the writ of Habeas Corpus belongs to all men, and shall not be suspended, unless by the King, when in cases of rebellion or invasion, the public safety shall require its suspension.

Article 6. No person shall be subject to punishment for any offense, except on due and legal conviction thereof, in a Court having jurisdiction of the case.

Article 11. Involuntary servitude, except for crime, is forever prohibited in this Kingdom; whenever a slave shall enter Hawaiian Territory, he shall be free.

Article 17. The Military shall always be subject to the laws of the land; and no soldier shall, in time of peace, be quartered in any house without the consent of the owner; nor in time of war, but in a manner to be prescribed by the Legislature.

Article 37. The King, in case of invasion or rebellion, can place the whole Kingdom or any part of it under martial law.

**Constitution of 1887 (Monarchy)** Article 5. The privilege of the writ of Habeas Corpus belongs to all men, and shall not be suspended unless by the King, when in cases of rebellion or invasion, the public safety shall require its suspension.

Article 6. No person shall be subject to punishment for any offense, except on due and legal conviction thereof, in a Court having jurisdiction of the case.

Article 17. The Military shall always be subject to the laws of the land; and no soldier shall, in time of peace, be quartered in any house without the consent of the owner; nor in time of war, but in a manner to be prescribed by the Legislature.

Article 37. The King, in case of invasion or rebellion, can place the whole Kingdom, or any part of it, under martial law.

**Constitution of the Republic of Hawaii 1894.** Article 5.—Writ of Habeas Corpus. The privilege of the Writ of Habeas Corpus belongs to all men, and shall not be suspended, except by the President or by one of the Cabinet Ministers as herein provided, when in case of rebellion or invasion, or imminent danger of rebellion or invasion, the public safety shall require its suspension. Provided, however, that no alien unlawfully entering the Republic shall be entitled to this Writ as of right.

Article 6.—Right of trial. Section 1. No person shall be subject to punishment for any offense except on due and legal conviction thereof by a tribunal having jurisdiction of the case.

Article 9.—Slavery. Involuntary servitude, except for crime, is forever prohibited in this Republic. Whenever a slave shall enter the Territory of this Republic he shall be free.

Article 13.—Military Subject to Law. Section 1. The Military shall always be subject to the laws of the land.

Section 2. No soldier shall, in time of peace, be quartered in any house without the consent of the owner; nor in time of war, but in a manner prescribed by the Legislature.

Article 31.—Martial Law. Suspension of Habeas Corpus. The President, or one of the Cabinet Ministers as herein provided, may, in case of rebellion, or invasion, or imminent danger of rebellion or invasion, when the public safety requires it, suspend the privileges of the writ of habeas corpus or place the whole or any part of the Republic under martial law.

Article 100.—Advisory Council. Until the convening of the first Legislature, in either special or regular session, the members of the Advisory Council of the Provisional Government of the Hawaiian Islands shall constitute a council to be styled the "Advisory Council of the Republic of Hawaii."

The Advisory Council of the Republic of Hawaii and the Executive Council, sitting together, shall be vested with all the powers and authority heretofore vested in the Executive and Advisory Councils of the said Provisional Government, and also all the powers and authority by this Constitution granted to the Senate or to the Legislature.

Such convening of the Legislature shall thereby terminate the existence, power and authority of the Advisory Council.

**Proclamation.**

Executive Building, Honolulu, H. I., Jan. 7, 1895.

The right of Writ of Habeas Corpus is hereby suspended and Martial Law is instituted and established throughout

things civil as well as military, was the basis of action, which, I think, cannot be justified in law. And whether such action was done under one title or under another does not change its legal status.

The significant thing is that the Com-

the Island of Oahu to continue until further notice, during which time, however, the Courts will continue in session and conduct ordinary business as usual, except as aforesaid.

By the President:

Sanford B. Dole,

President of the Republic of Hawaii.

J. A. King,

Minister of the Interior.

**Act 18. An Act Providing for the Carrying out by the Marshal or his Deputy of Sentences of Military Commissions and Courts Martial.**

Be it enacted by the Executive and Advisory Councils of the Republic of Hawaii:

Section 1. It shall be the duty of the Marshal or his Deputy, whenever so required by the order of the Commander in Chief of the Military Forces, or by the Precept or Mandate of the President, and upon and in conformity therewith, to execute and carry out the sentence of any Military Commission or Court Martial convened, or to be convened, in the manner and at the time and place designated in the order approving the findings and proceeding of and confirming or modifying the sentence imposed by such Military Commission or Court Martial.

Any jail or prison of the Republic or other place designated by the President or Commander in Chief may be used as a place of imprisonment or detention of any person convicted and sentenced to imprisonment by any such Commission or Court Martial.

Section 2. This Act shall take effect from the date of its approval.

Approved this 8th day of February A. D. 1895.

(Signed) Sanford B. Dole,

President of the Republic of Hawaii.

(Signed) J. A. King,

Minister of the Interior.

**Act 20. An Act Relating to Martial Law, Trials by Military Commission and the Liability of Officers of the Government and Others for Acts Done in Suppressing Rebellion.**

Whereas, Being seduced by the insidious counsel of wickedly designing persons, many individuals resident in the Island of Oahu did conspire by force to overthrow the Constitution and Government here established by law, and in furtherance of such, their purpose did with force and in confederated multitude on the 6th day of January, 1895, and on divers other days then following, in the District of Honolulu, Island of Oahu, levy war against this Republic, and did commit murder and other felonies, and did provide themselves with arms, ammunition and dynamite with treasonous purpose, and with intent to terrorize the inhabitants of the city of Honolulu, and for a time to overturn and destroy all government; and

Whereas, Upon being informed of said rebellion the President in pursuance of his Constitutional Authority did proclaim that Martial Law should obtain and prevail throughout the Island of Oahu; and Whereas, The Military and Police Forces of this Government, with the loyal co-operation of other residents of the Hawaiian Islands, have arrested the spread of said rebellion, and have saved the lives and property of law abiding citizens from imminent general sacrifice; and

Whereas, It is expedient that all persons, who in good faith have acted for the crushing of rebellion, should be indemnified and kept harmless for such, their acts of loyalty:

Be it enacted by the Executive and Advisory Councils of the Republic of Hawaii:

Section 1. All proclamations and orders published or made and all acts, matters and things commanded, directed or done, or to be commanded, directed or done by the President, or by any officer of the Government, or other person acting under the authority of the President, for the purposes and during the time herein declared, that is to say, on, from and since January 6th, 1895, until martial law shall be declared to be no longer in force, whether done in a district in which martial law was proclaimed or was in force, or done in a district in which martial law was not in force, in the proclamation or furtherance of martial law, or in the suppression of insurrection, or in the establishment of a military tribunal, or in the arrest, imprisonment, deportation, trial, conviction or sentence of any person charged with treason, misprision of treason, conspiracy to incite or commit treason, or with any disloyal or seditious practice or with any act or conspiracy dangerous to the peace or to the safety of life or property or in the arrest and detention of persons held for investigation, are hereby declared to have been done within the constitutional authority of the President and are confirmed.

manding Officer, as I shall call him, did act closely upon the pattern of a Military Governor in conquered foreign territory, by issuing rules of conduct for the civilian population as General Orders, closing all courts and then permitting some of them to function under the directive that they were doing so as agents of the Military Governor.[7] The same procedure was followed as to other civil officers and em-

Section 2. This Act shall take effect from and after the date of its publication.

Approved this 15th day of March A.D. 1895.

(Signed) Sanford B. Dole,
   President of the Republic of Hawaii.
(Signed) Francis M. Hatch,
        Minister of Foreign Affairs.

Act 22. An Act to Repeal Sections 2, 3, 4, 5 and 6 of an Act Entitled, "An Act to Provide for the Bringing of Suits By or Against the Hawaiian Government," Approved September 6, 1888.

Be it enacted by the Executive and Advisory Councils of the Republic of Hawaii:

Section 1. Sections 2, 3, 4, 5 and 6 of an Act entitled, "An Act to provide for the bringing of suits by or against the Hawaiian Government," approved September 6, 1888, are hereby repealed.

Section 2. This Act shall take effect from the date of its publication.

Approved this 15th day of March A.D. 1895.

(Signed) Sanford B. Dole,
   President of the Republic of Hawaii.
(Signed) Francis M. Hatch,
        Minister of Foreign Affairs.

Act 24. An Act to Prevent the Bringing of Actions Against Officers of the Government or Others for Acts done in Suppressing Rebellion.

Be it enacted by the Executive and Advisory Councils of the Republic of Hawaii:

Section 1. No prosecution, indictment, action or suit shall be maintained in any court, criminal or civil, against any officer of the Government or other person acting bona fide under the authority of the President or in good faith for the purpose of suppressing rebellion, for any acts, matters and things done or omitted to be done, or which shall be done, on, from and since January 6, 1895, until martial law shall be declared to be no longer in force, whether done in a district in which martial law was proclaimed or in force, or done in a district in which martial law was not in force, in the suppression of rebellion or in furtherance of the object of martial law, or in the arrest, imprisonment, deportation, trial, conviction or sentence of any person charged with treason, misprision of treason, conspiracy to incite or commit treason or with any disloyal or seditious practice or act or with any act or con-

spiracy dangerous to the peace or the safety of life or property, or in the arrest and detention of persons held for investigation.

Section 2. In order to prevent any doubt which might arise whether any act alleged to have been done, as aforesaid under the order or authority of the President or to have been done bona fide in order to suppress insurrection was so done, it shall be lawful for the President or his successor to declare such acts to have been done under such order or authority of bona fide for the purpose aforesaid; and such declaration by any writing under the hand of the President or his successor shall in all cases be conclusive evidence that such acts were so done respectively; and such order or declaration may be shown under the general issue or pleaded in bar; and if so pleaded such plea shall suffice, although it may set out merely the general effect of such order or declaration or the fact only that such order or approval was given prior to the matter complained of or has been since received.

Section 3. This Act shall take effect from and after the date of its publication.

Approved this 15th day of March, A. D. 1895.

(Signed) Sanford B. Dole,
   President of the Republic of Hawaii.
(Signed) Francis M. Hatch,
        Minister of Foreign Affairs.

[7] Berdahl, War Powers of the Executive in the United States (1920) C. IX;

Gabriel, American Experience with Military Government (1943) 37;

American Politic Science Review 417;

The Rules of Land Warfare (FM 27-10, War Department 1940):

"Military government is the organization through which a belligerent exercises authority over the territory of the enemy invaded and occupied by him. The necessity for such government arises from the failure or inability of legitimate government to exercise its functions on account of the military operations or occupation."

Fairman, The Law of Martial Rule (1943) p. 6, § 2: "Martial Law Applied to Civilians."

Birkheimer, Military Government and Martial Law (3rd Ed. 1892);

Wiener, A Practical Manual of Martial Law (1940) p. 16; "Fundamental Principle of Martial Law.—Martial law is

ployees of both the United States Government and the Territory. Provost courts were set up, manned by military officials, and these courts were authorized to try civilians, without juries, upon charges preferred by the military as to offenses prescribed by the civilian laws and by General Orders of the Commanding Officer or Military Governor. The sentences were in some instances fixed within the statutory provision of statutory offenses of like nature and in some instances greater than the maximum fixed by statute.

These provost courts have continued and do now continue to function. There is no claim in this proceeding that there was, at any time subsequent to the day of the aircraft attack, any fighting or any disturbance of any kind at any place in the Territory, which acted to prevent any court, United States or Territorial, from being open for the transaction of regular business. In fact both national and territorial courts sat on the morning following the attack, and were allowed to and did finish cases in process of trial. Commercial business continued without change of standard practices with exceptions required by the military.

On July 23, 1942, United States District Judge Ingram M. Stainback was appointed to succeed Governor Poindexter, and soon thereafter the new Governor journeyed to the nation's capital, where he conferred with representatives of the Departments of War, Interior and Justice, and returned to the Islands with a compromise as to government, which relaxed the existing military government very materially. In Governor Stainback's procla-

mation of September 2, 1942, the duties conceded to the civil government were enumerated,[8] and United States and Territorial courts were permitted to open with some restrictions and they did open and from such time have functioned. The provost courts and a higher court of first instance, known as Military Commissions, continued. Regular elections were held throughout the Territory in the Fall of 1942, and the legislature convened in regular sessions at Honolulu from February 17, 1943, through its statutory period of 60 days, passing 217 laws. One of the measures passed was a comprehensive amendment of the Hawaiian Defense Act enlarging the Governor's powers, and on March 10, 1943, Restoration of Civil Rights in Hawaii was celebrated by a joint session of both legislative houses, at which the Commanding General was honored and upon invitation he addressed the assembly, congratulating the people for their steadfastness, and gave his reasons for retaining certain powers ordinarily exercised by civil agencies. All existing military orders were revoked and rules and regulations under the Defense Act were promulgated.

The evidence without conflict establishes that the commanding officers of the Army and the Navy were convinced beyond any doubt at all that after the defeat of the Japanese in the great air and naval battle of Midway the Hawaiian Islands were secure from any invasion such as would encompass a bridgehead or permit of a land occupation. They were, however, just as positive in their opinions that it lay within the power of the Jap-

---

the public law of necessity. Necessity calls it forth, necessity justifies its exercise, and necessity measures the extent and degree to which it may be employed. That necessity is no formal, artificial, legalistic concept but an actual and factual one; it is the necessity of taking action to safeguard the state against insurrection, riot, disorder, or public calamity * * *."

[8] In giving his approval to the relaxation of military control as indicated in Governor Stainback's proclamation

"I am confident that the military and civil authorities will cooperate fully. If an occasion should arise on which, after consultation with the civil authorities, the Commanding General [note—not the Military Governor] felt it necessary to take action [in regard to reasserting claims relinquished] * * * I should like to

be informed of the circumstances under which such action was taken. I hope also that there will be a further restoration of civil authority as and when the situation permits."

The relinquished judicial powers included all civil and criminal proceedings, except (1) criminal prosecutions against members of the armed forces. Members of auxiliary armed forces shall be included within the term "armed forces" after induction into the service and also before induction in respect of any act or omission certified by the Commanding General to be in the line of duty. (2) Civil suits against members of the armed forces, as defined in subparagraph (1) in respect to any act or omission certified by the Commanding General to be in the line of duty. (3) Criminal prosecutions for violations of military orders.

anese to land raiding parties and project suicide squads in airplanes to some extent from submarines and carrier ships up to the time of the hearing of the instant case. They were of the opinion that raiding parties might gain valuable information or might release spies who could, perhaps, secure and communicate valuable information to the enemy.

Governor Stainback testified that he was well acquainted with affairs of the Islands generally, that there were no general disturbances among the people, that there has been no known sabotage on the Islands since the attack, and that there was none during the attack and all of this was undisputed. The Governor also testified that in his opinion there has been no need for martial law or for the suspension of the writ since the battle of Midway and that since that event, at most, there has been no invasion or imminence of invasion. He estimated that 95% of the civil government had been turned back into the normal channels by his relaxing proclamation. The Commanding Officers of the Army and Navy, however, testified that the nature of attacks, above described as possible, were imminent. There was testimony that there has always been a strong patriotic loyalty among the Hawaiian born Japanese people,[9] but that some residents of Japanese ancestry were not loyal to the United States, and some have been arrested and interned for espionage.[10]

There is testimony of statements from high officers of the armed forces in the Pacific that by the time of the happening at the naval gate, between the marines. and Duncan, the enemy was on the defensive, and that the United States was successfully defeating him in many encounters, and had taken and held islands far to the westward of the Hawaiians from his possession.

The most potent testimony, both factual and argumentative, relating to the retention of provost courts, and respecting the imminence of invasion and safety of the public through the suspension of writ, is that of Lt. Gen. Richardson, Military Commander of the Territory, from which I quote in the margin.[11] The record sup-

---

[9] The Japanese in Hawaii Under War Conditions, Lind, Records of American Council Institute of Pacific Relations (1943);

Senate Document No. 151, 75th Congress 3rd Session.

[10] A letter is in evidence dated April 30, 1943, in which Colonel Kendall J. Fielder, head of military intelligence in Hawaii from June, 1941, states:

"There have been no known acts of sabotage, espionage or fifth column activities committed by Japanese in Hawaii, either on or subsequent to December 7, 1941."

[11] "Q. In other words, these successes [in the Pacific], from the military point of view, in your opinion, do not lessen the danger of an attack on these islands by the Japanese? A. Indeed, they do not, and that cannot be said too emphatically.

"Q. Now, General, turning to the subject of the provost courts, which Counsel has mentioned, will you state how you perceived the provost courts to be part of the military security system? A. Well, in order to enable me to discharge my responsibilities under this modified form of martial law, and in order to achieve the security which is the only reason really for the prevalence and existence of the modified form of martial law here, I am concerned, as a soldier, with my duties of security. We have been obliged to publish regulations for the control of firearms, for the control of ammunition, for the illegal possession of radios, for the illegal possession of cameras, for the institution of the curfew, for the institution of the blackout, for the ejection of undesirables from restricted areas. In order to enforce those regulations, I must have at my disposal some sort of tribunal to that effect.

"Under the rules of martial law, we are authorized to appoint what is known as provost courts. These provost courts. are nothing more or less than police courts. The layman might say, Why not do away with them? I personally have given great consideration to the elimination of provost courts, in order to try and carry out the directions of the President when he approved the suspension of the privilege of the Writ of Habeas. Corpus and also the continuation of martial law in this Territory last, hoping that I would be able to do away with the provost courts and turn the trial of those offenses over to the civil courts. But upon examination of the circumstances I found that it is impossible for the civil courts to try them because they are not offenses against Territorial laws, nor are they offenses against any known Federal statute.

"Now, in rebuttal it will probably be said, but under the Organic Act the Governor can publish regulations for the pun-

ports appellee's comment upon General Richardson's testimony in his brief, and I quote: "General Richardson admitted that he was unfamiliar with the courts of Hawaii and had no knowledge of any delays, he saw no distinction between his

ishment of infractions of these offenses.

"Q. Under the Hawaiian Defense Act? A. Under the Hawaiian Defense Act, as he did in the curfew and the blackout. But I should like to point out that in that instance—assuming that he did and that they were perfectly legal—then the violation of any of those offenses would have to be referred to a civil court for trial, with its concomitant delay. The military are the ones that detect these offenses. The military hold the witnesses, as a rule, and therefore we cannot brook a delay. And there must also be in the punishment a certain measure of retribution. The punishment must be swift; there is an element of time in it, and we cannot afford to let the trial linger and be protracted.

"Again, to give another illustration, assuming that the Governor did punish regulations to this effect, I am forced then to be subjected, as Military Commander responsible for the security of these islands, I am forced to the control of another official for the enforcement of my regulations. To illustrate, well, suppose that we did turn them over to the civil authorities and that I had set the curfew, or the Governor had set the curfew at 10 o'clock. An emergency arises, and I feel that it should be changed instantly to 8 o'clock. I call upon the Governor. He says, No;—not arbitrarily but because he has a very honest difference of opinion—no, I think it should remain at 10 o'clock. And he refuses, therefore, to modify his order. What am I to do as Military Commander responsible for the security of these islands? The only recourse left is to re-invoke martial law, and then we are back where we started.

"Q. Well, Counsel mentioned the power to set up a military area under Executive Order 9066, and to promulgate regulations in that way. Would that meet your problem of military security? A. No, it would not, for the following reason: We will assume that we are operating under Executive Order 9066. All of the offenses are contained therein, if violated by anyone in this Territory, must of necessity be referred to the civil courts. The Military Commander, then, is subjected to all sorts of influences, political and otherwise, as happened in the cases on the east coast in both Philadelphia and Boston, when the Commander of the Eastern Defense Command ejected what he considered undesirable persons from the areas, and he was over-

ruled by the courts and they were put in.

"Now, in an area of this character, the Hawaiian group, which is an active theatre of war and which is in the theatre of operations, it is inconceivable that the Military Commander should be subjected for the enforcement of his orders to the control of other agents.

"Q. Well, I take it, General, from the military viewpoint, then, you believe that your responsibility for the military security requires that you have an agency under your control to enforce your military security regulations, is that what it comes down to? A. I do.

"Q. Now, General Richardson, based upon your appraisal of the military situation, will you state your opinion as to whether or not there is imminent danger of invasion of this Territory by the Japanese enemy? A. I shall state from a soldier's point of view the actual reality of the situation, without attempting to argue or define the academic definition of 'imminent danger of invasion.' We know that, at least we feel quite certain that the Japanese are totally incapable of coming to these islands with a large land-based force for the purpose of seizing and capturing it. We do not think that is within their capability at all. The time for that is past. And, therefore, if that interpretation is paramount in the mind of the layman, it may be eliminated. But you must remember that in law, as in other branches and other professions, times change. There are new developments. When that phrase was written, 'imminent danger of invasion,' nor the submarine, nor the airplane were in existence, nor were they ever dreamed of. These two new weapons of war have enormous potentialities, and they have introduced into warfare the element of stealth, the element of surprise, and the element of speed. And, therefore, capitalizing on these new elements of warfare, our enemy, the Japanese, has at his disposal today a strong carrier force, destroyers, cruisers, battleships, and airplanes, and submarines, all of which combine those elements of stealth, surprise and speed.

"Therefore, they still have the capability of launching an attack, an invasion by air, an invasion by undersea, against these islands. And they have not only the capability itself; it is always impending, as long as their capability exists, the danger impends and the danger is imminent."

mission as a soldier in Hawaii and his political mission, but he conceded that the need for the existence of a military tribunal to enforce the Commanding General's orders in Hawaii was no greater than the need for such a tribunal in California, Maryland or Pennsylvania."

The decisive questions posed to the District Court were: Was the privilege of the writ of habeas corpus legally available to Duncan? Did the Provost Court have legal jurisdiction over Duncan?

I assume without deciding that the Hawaiian Organic Act, wherein the right to suspend the writ .is extended beyond the United States constitutional limitation, is the law of the Territory, and that the privilege may be suspended "in the imminent danger" of invasion. It follows, in accord with my discussion as to the court's jurisdiction, that the suspension cannot be legal unless there is as a fact imminent danger and that because of imminent danger the public safety requires the suspension of the writ.

It is, of course, more harmful than beneficial to approach the construction of a written law from the strict technical or scholarship standpoint. Neither will it do to read it as though it had been thrown together loosely from colloquial conversations. The words of the United. States Constitution were weighed by careful, practical, scholarly men, conscious that they were writing for posterity.[12] This, if anything, was more emphatically true as to the amendments. Therefore, when the short and pithy Clause 2, § 9 of Article I, was composed, it was worded with such care that construction would not be needed. Its authors and advocates republished this early Anglo-Saxon .writ of freedom in the Constitution, and for fear exceptions might be declared as reasonable, which would weaken its usefulness, they wrote in the only exceptions permissible—come what emergencies may. *"The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the Public Safety may require it."* The Hawaiian Organic Act has extended the permissible circumstances to include imminence of danger of rebellion or invasion *until* the President's decision. It is safe to say that the Congress did not make this extension with any careless use of the term "imminent danger." Imminent danger is not merely danger nor just possible nor probable danger. The significance of the word "imminent "is that it is a warning that necessity must be at hand before the right to the writ can be denied to one who desires to avail himself of it. Definition [New Standard Dictionary (Funk & Wagnalls)]: Threatening to happen at once, as some calamity; dangerous and close at hand; impending; as, imminent peril.*

There was no rebellion nor any invasion during the period of Duncan's altercation at the Navy Yard Gate, his trial and application to the United States Court for release from custody.[13] There was some danger of hit and run attacks upon

---

[12] Farrand, Records of the Federal Constitution Convention (1911) II 438 and III 149.

* Syn: impending, threatening. **Imminent**, from the Latin, with the sense of projecting over, signifies liable to happen at once, as some calamity. **Impending**, also from the Latin, with the sense of hanging over, is closely akin to **imminent**, but somewhat less emphatic. **Imminent** is more immediately, **impending** more remote, **threatening** more contingent. An **impending** evil is almost sure to happen at some uncertain time; an **imminent** peril is one liable to befall very speedily; a **threatening** peril may be near or remote, but always with hope that it may be averted.—Ant: chimerical, contingent, doubtful, improbable, problematical, unexpected, unlikely.

[13] The following is from Fairman, Law of Martial Rule, 2d Ed., p. 127: "This view of the law was held by the law officers of the Crown who were called upon to give an opinion as to the legality of adopting punitive measures against the Canadian insurgents in the rebellion of 1837–38:

"When the regular Courts are open, so that Criminals might be delivered over to them to be dealt with according to Law, there is not, as we conceive, any right in the Crown to adopt any other course of proceeding. Such power can only be conferred by the Legislature * * *.

"In the parliamentary debate on martial rule in Demerara the traditional view was expressed by Sir James Mackintosh in the following oft-quoted passage:

"The only principle on which the law of England tolerates what is called martial [law], is necessity: its introduction can be justified only by necessity: its continuance requires precisely the same justification of necessity: and if it survives the necessity on which alone it

the Hawaiian Islands from the enemy. There was no danger whatever of invasion in the sense of forced entry with the power to resist expulsion even for a short period. There was possibility of an attempt at hit and run performances, but there is not a factual word in the evidence as to imminence of invasion. Neither the District Court nor this court has a right to modify the meaning of the word imminence to the weaker meaning "possible but hardly probable." If the theory of General Richardson is adopted, that because of the great change in engines of war anything can happen and because there may be conflict between civil and military commands and the facility of handling the military problems may be hindered by the functioning of civil officials, the writ can and should be suspended, then the effectiveness of the great writ of personal freedom will soon be chiseled away to nothing. It is in war times that its usefulness blossoms.[14] If more were needed, what parts of the evidence, may I ask, bears upon the effect that the privilege of the writ granted to Duncan would have any relation to a rebellion or invasion, or where is the proof that any harmful effect could come to the prosecution of the war by the court's issuing a show cause order in any case? No judge would have allowed the revelation of anything of the kind. If there was the slightest hint that Duncan's alcohol confused brain was related to any

scheme of sabotage or disloyalty of any kind different questions would be presented. I repeat that the whole theory that the suspension of the writ can ever be accomplished just as an assistance to the military has led appellant into error. And the error goes even deeper—it is the error that the Territory was being legally governed by military rule.

Ours is a government of laws and not of men. A government of laws means not a government of men but a government of prescribed law by and through its administration by men. The government of Hawaii, under the dominance of a Military Governor, is not a government of law at all—it is a one-man government. The Military Governor or the Commanding General recognized no other superior than the President, who, of course, could not be acquainted with details. The Commanding General adopted the local law if it suited him, and made new law by decree when it suited him. He used the legally constituted judiciary and courts and other local departments and their personnel in some instances, and created other courts and officers with his appointees as he thought best to do. When the regular official departments and personnel were used, they were said to have acted as agents of the Military Governor.

This was not martial law—it was military rule, which is no law at all.[15] There is no other instance of its kind in American history.[16] There is nothing in the

---

rests for a single minute, it becomes instantly a mere exercise of lawless violence. When foreign invasion or civil war renders it impossible for courts of law to sit, or to enforce the execution of their judgments, it becomes necessary to find some rude substitute for them, and to employ, for that purpose, the military, which is the only remaining force in the community. While the laws are silenced by the noise of arms, the rulers of the armed force must punish, as equitably as they can, those crimes which threaten their own safety and that of society; but no longer; every moment beyond, is usurpation: as soon as the law can act, every other mode of punishing supposed crimes is itself an enormous crime."

[14] Hurd, A Treatise on the Right of Personal Liberty and the Writ of Habeas Corpus (2d Ed. 1876), p. 116.

[15] Fairman, The Law of Martial Rule, 2d Ed., p. 28: "The Nature of Martial Rule. People imagine, when they hear the expression martial law, that there is

a system of law known by that name, which can upon occasion be substituted for the ordinary system; and there is a prevalent notion that under certain circumstances a military commander may, by issuing a proclamation, displace one system, the civil law and substitute another, the martial * * *.

"Let us call the thing by its right name; it is not martial law, but martial rule.

"David Dudley Field, in his argument in Ex parte Milligan, 1866, 4 Wall. 2, 35, 18 L.Ed. 281."

[16] This is true, except, perhaps, the instance revealed in the trial of and petition for certiorari after conviction. Ex parte Vallandigham, 1 Wall. 243, 68 U. S. 243, 17 L.Ed. 589. It would be interesting to compare this case with Ex parte Quirin, supra, as well as to this case. The case was disapproved of by the Supreme Court, nor upon its merits, but upon the fact that certiorari does not issue from a military court. Had the

Hawaiian Organic Law authorizing it.[17] There is no contemplation in any law that a civil governor will ever abdicate any of his powers. This nation is so firmly committed to the civil management of its affairs in war as well as in peace that the President, as a civilian, is the Commander-in-Chief of the Army and Navy. In the largest sense the President is the Supreme Marshal or High Sheriff, directing the armed forces under his command[18] as to the major objectives, just as a Governor of a state calls the militia to his aid in a great emergency.[19] The troops or their officers never succeed to supreme command. They execute the directive of the Governor.[20] As is well said in appellee's brief: "When Admiral Nimitz invaded the Marshalls, he recognized no municipal law of the enemy state, in fact his mission was to destroy all resistance. His will is law subject only to the application of the laws of war in such cases. On the other hand when our own military authorities, acting under martial law, exercise extraordinary powers over our own people, they do so in subordination to the civil power. Their function is not to conquer and govern but to defend and sustain the civil power."

Hawaii is no different from the states in this regard. "The governor shall be responsible for the faithful execution of the laws of the United States and of the Territory of Hawaii * * * and whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States * *

or summon the posse comitatus." Act of April 30, 1900, supra.

Martial law is a different system of government by the military than military law, or, as some authorities prefer to call it, military rule. The Supreme Court has very recently made significant expressions in regard to martial law in the Japanese cases.[21] There may be martial law in the field of operations. It is administered by the military and the President under broad acts of Congress. The use of power under such acts has been of great practical benefit, especially on the Pacific Coast during this war. Britain has used it in this war, never going to military rule, no matter what the emergency. In no case under this practice has any attempt been made in the long beleaguered Island of the English to suspend the privilege of the writ of habeas corpus nor to deprive any person of his day in a regularly constituted court.

Removal of objectionable personages from defense localities, curfew laws, blackout regulations and many other regulations of the civil population have been in practical use and have been sustained by the courts as legal. Fairman, The Law of Martial Rule (2d Ed.) p. 46: "Martial law is elastic in its nature, and easily adapted to varying circumstances. It may operate to the total suspension or overthrow of the civil authority; or its touch may be light, scarcely felt or not felt at all by the mass of the people, while the courts go on in their ordinary course, and the business of the community flows

case gone to the Supreme Court upon a petition for habeas corpus, as did the Milligan and Quirin cases, there can be little doubt that the military trial would have been nullified. Compare, also, Ex parte Merryman, 1861, 17 Fed.Cas., page 144, No. 9487.

[17] See Anthony, Martial Law in Hawaii; 30 Cal.Law Rev. 371; 31 Cal. Law Rev. 477; Col. King, "The Legality of Martial Law in Hawaii"; 30 Cal. Law Rev. 599.

[18] Mr. Hughes (subsequently Chief Justice) in American Bar Association Reports, Vol. XLII (1917), p. 244, says: "There is no more impressive spectacle than that of the President of the Republic in time of war when in addition to the other great powers of his office he acts in supreme command of the armed forces of the Nation and conducts its military campaigns."

[19] Law officers, Sir John Scott and Sir John Mitford [1796 in Clode, Mil. Forces, II, 638 (as quoted in The Law of Martial Rule, 2d Ed., Fairman)]: "So far as is consistent with obedience to military discipline and command, we apprehend the civil magistrates have power to call for the assistance of the military as they have to call for the assistance of other of His Majesty's subjects. * * * But we apprehend the magistrates cannot require from the military any assistance repugnant to the obligations of their military duty."

[20] See Federal Aid in Domestic Dist., Doc. No. 263 Sen. Doc. C. 19, 67th Congress 2d Session 10, 31-2.

Rich, The Presidents and Civil Disorder, 2ff.

[21] Hirabayashi v. United States, 320 U. S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774.

in its accustomed channels." The touchstone of the measure of power properly and legally enforceable under martial law or military law is "necessity." Fairman, The Law of Martial Rule (2d Ed.) p. 50: "I conceive it is the better opinion that the law of England, born and nurtured in times when war within the realm was very possible, is not without resources in the face of rebels and public enemies; that a right arising from and commensurate with the necessity is a part, though an extraordinary part, of the Common law. Sir Frederick Pollock, The Expansion of the Common Law, 105."

The troublesome feature of the situation is how, when, where and by whom shall the "necessity" be adjudged. Its use is plain and this trouble does not arise in the midst of immediate combat, where, for the moment at least, the Commanding Officer is the dictator of both civil populace and military forces under usual and practiced rules of war where possible. A Commanding Officer would find no court putting the seal of legality upon acts done under a declaration of martial law in a locality far removed from any war activity of any kind, but the line of demarkation cannot be defined.

As to this case wherein the ordinary affairs of society are progressing according to normal pattern, but with pressures here and there, with business and 95% of government being handled by normal civil agencies, and all courts open, able to and actually functioning, there is no color of authority for the military to arrest a civilian, try and convict him, and send him to jail by order of a provost court, and that without the right of a jury.

The landmark case, Ex parte Milligan, 71 U.S. 2, 18 L.Ed. 281 [22] as it seems to me, rests upon sound reasoning in its essence. The liberal excerpts in the report of this case from the arguments constitute on the part of the petitioner's counsel admirable essays on the struggle for liberty with long and able reaches into history by great and honorable men. For the most part this cannot be said for the respondent's side. The Attorney General, as it was his duty to do, presented as able an argument as could be made upon the jurisdiction of the court and there he stopped. Argument upon the merits of

military commission trials was by one who performed his part in character.[23] This man's career contains no bright areas of righteousness or love for the principles of the Bill of Rights. He wove into his argument the foul slander that the greatest peril suffered by the Union in our internecine war "is imbecility of the administration." (The administration of Abraham Lincoln and his successor Andrew Johnson) "It is getting rid of that danger," he said, "unenumerated, that we have to use military power, military orders, military law and military commissioners." But the court unanimously rejected these calumnies and specious arguments. Mr. Hughes (subsequently Chief Justice) in American Bar Association Reports, Vol. XLII (1917) p. 244, commented upon that case as follows: "The court was unanimous in the opinion that under the terms of the Act of Congress creating the commission it had no jurisdiction. But the majority of the Court went further and declared that Congress was without power to provide for the trial of citizens by military commissions save in the locality of actual war and when there was no access to the courts. Maintaining with eloquent emphasis the guarantees of freedom contained in the Fifth and Sixth Amendments, the majority of the Court asserted that 'Martial law cannot arise from a threatened invasion. The necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration * * *. Martial rule can never exist where the courts are open, and in the proper unobstructed exercise of their jurisdiction. It is also confined to the locality of actual war.' "

At one place in the majority opinion of the Milligan opinion it is said: "If this position is sound to the extent claimed, then when war exists, foreign or domestic and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules."

There is no great fundamental difference

---

[22] See Ex parte Quirin, **supra**, for a discussion of trials by military commission.

[23] Ben Butler.

between the Milligan case and the instant one, but the cases are set in radically different circumstances. At the time of the Milligan case there was a mad radical group ready for revenge and plunder and the dark chapter of American history in the decade following 1864 would have been longer and more to be regretted but for the courage and wisdom of the Supreme Court Judges sitting in the Milligan case. In the Duncan case the actors are all deeply concerned with the winning of a great war, which in itself will advance the cause of civil rights of the American ideals immensely. But the very integrity of intention may endanger the constitutional safeguards to individual freedom by the creation of destructive precedent.

The courts being open and functioning properly accorded the prisoner this rightful privilege of the writ of habeas corpus and upon the showing made in this case properly ordered him released from custody and restored of his liberty. The orders of the district court should be affirmed.